G66HMCCS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                                    15 CR 100 (GHW)


SEAN McCABE,

                                    Sentence
         Defendant.

------------------------------x

                                    New York, N.Y.
                                    June 6, 2016
                                    2:40 p.m.


Before:

                    HON. GREGORY H. WOODS,

                                    District Judge

                        APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
EMIL BOVE
    Assistant United States Attorney

ROBERT S. GERSHMAN
    Attorney for Defendant

G66HMCCS

| | |
|---|---|
| 1 | (Case called) |
| 2 | MR. BOVE:  Good afternoon, Your Honor.  Emil Bove for |
| 3 | the government. |
| 4 | THE COURT:  Thank you.  Good afternoon. |
| 5 | MR. GERSHMAN:   Good afternoon, your Honor.  Robert |
| 6 | Gershman on behalf of Mr. McCabe, who is present next to me. |
| 7 | THE COURT:  Good afternoon. |
| 8 | Good afternoon, Mr. McCabe. |
| 9 | THE DEFENDANT:  Good afternoon, your Honor. |
| 10 | THE COURT:  We're here to conduct a sentencing hearing |
| 11 | for Mr. McCabe.  I've received and reviewed the following |
| 12 | materials in connection with the sentencing:  A presentence |
| 13 | report dated May 13, 2016; the defendant's sentencing |
| 14 | memorandum, which is dated May 19, 2016, together with its |
| 15 | exhibits; the government's sentencing memorandum, which is |
| 16 | dated May 27, together with its exhibits.  Just before I took |
| 17 | the bench, I was also handed a letter to me dated today from |
| 18 | Mr. McCabe.  I just read this letter.  It is not posted to ECF. |
| 19 | Mr. Bove, have you received this letter? |
| 20 | MR. BOVE:  I just received it as well, your Honor. |
| 21 | THE COURT:  Let me ask, then, have each of the parties |
| 22 | received all of the materials that I've just described? |
| 23 | MR. BOVE:  Yes, your Honor. |
| 24 | MR. GERSHMAN:  Defense has, Judge. |
| 25 | THE COURT:  Thank you.  Have the two sentencing |

G66HMCCS

```
 1    memoranda been filed with the clerk of court?

 2              MR. BOVE:  The government's has, your Honor.

 3              MR. GERSHMAN:  Defense as well.

 4              THE COURT:  Are there any other submissions in

 5    connection with the sentencing?

 6              MR. BOVE:  Not from the government.

 7              MR. GERSHMAN:  I would just ask maybe till tomorrow

 8    after I leave to upload the letter that your Honor received

 9    today.

10              THE COURT:  Thank you.  I will take care of that.

11              MR. GERSHMAN:  Thank you, Judge.

12              THE COURT:  Thank you.

13              Mr. Gershman, have you read the presentence report?

14              MR. GERSHMAN:  I have, your Honor.

15              THE COURT:  Have you discussed it with your client?

16              MR. GERSHMAN:  I have your Honor.

17              THE COURT:  Mr. McCabe, have you read the presentence

18    report?

19              THE DEFENDANT:  I have your Honor.

20              THE COURT:  Thank you.  Have you discussed it with

21    your counsel?

22              THE DEFENDANT:  I have, your Honor.

23              THE COURT:  Have you had the opportunity to review

24    with your counsel any errors in the presentence report or any

25    other issues that should be addressed by the Court?
```

G66HMCCS

| | |
|---|---|
| 1 | THE DEFENDANT:  Yes, your Honor. |
| 2 | THE COURT:  Thank you. |
| 3 | Mr. Bove, have you read the presentence report? |
| 4 | MR. BOVE:  I have. |
| 5 | THE COURT:  Do you have any objections related to the |
| 6 | factual accuracy of the presentence report? |
| 7 | MR. BOVE:  No, your Honor. |
| 8 | THE COURT:  Thank you. |
| 9 | Mr. Gershman, do you have any objections related to |
| 10 | the factual accuracy of the presentence report? |
| 11 | MR. GERSHMAN:  I had filed, when the first report came |
| 12 | out, a variety of -- I don't think they're substantive -- that |
| 13 | might go to the scoring, but once the addendum came out, they |
| 14 | were appropriately notated in the paragraph.  So to that |
| 15 | extent, I would. |
| 16 | THE COURT:  Thank you.  That's not a completely clear |
| 17 | response to my question.  Do you have any objections related to |
| 18 | the factual accuracy of the presentence report?  If so, we'll |
| 19 | need to address them.  If not, I would adopt those factual |
| 20 | findings.  If so, however, I need to address any objections and |
| 21 | either rule on them or make a determination that they won't |
| 22 | have an impact on sentencing. |
| 23 | Do you have any objections related to the factual |
| 24 | accuracy of the presentence report? |
| 25 | MR. GERSHMAN:  No, your Honor. |

G66HMCCS

```
 1              THE COURT:  Thank you.

 2              Given that there are no objections to the factual

 3   recitations in the presentence report, the Court adopts the

 4   factual recitations in the presentence report.  The presentence

 5   report will be made a part of the record in this matter and

 6   will be placed under seal.  If an appeal is taken, counsel on

 7   appeal may have access to the sealed report without further

 8   application to the Court.

 9              Now, the district courts are no longer required to

10   follow the sentencing guidelines.  We are still required to

11   consider the applicable guidelines in imposing sentence.  And

12   to do so, it is necessary that we accurately calculate the

13   sentencing range.  In this case, the defendant pleaded guilty

14   pursuant to a plea agreement to conspiracy to commit money

15   laundering in violation of 18 U.S.C. Section 1956(h).  There is

16   a plea agreement in this case in which the parties stipulated

17   to a particular calculation of the sentencing guidelines.

18              Counsel, can I confirm that I'm correct that the

19   calculation in the presentence report is consistent with that

20   agreement with the exception of the sophisticated laundering

21   enhancement?

22              MR. BOVE:  Yes, your Honor.

23              MR. GERSHMAN:  Yes, your Honor.

24              THE COURT:  Thank you.

25              Mr. Bove, does the government agree that a two-level
```

G66HMCCS

adjustment is appropriate here under Section 3E1.1(a).

MR. BOVE:  Yes, Judge.

THE COURT:  Is the government moving for an additional one-level adjustment under Section 3E1.1(b)?

MR. BOVE:  I am.

THE COURT:  Thank you.

I calculate the sentencing guidelines in a manner consistent with the presentence report.  I find that the government has failed to meet its burden to demonstrate that the sophisticated money laundering enhancement in this case applies in the case of Mr. McCabe.  The applicable sentencing guidelines manual is the November 1, 2015, sentencing guidelines manual.  The base offense level is determined pursuant to Section 2S1.1.

Pursuant to Section 2S1.1(a)(2), the base offense level is eight plus the number of offense levels from the table in Section 2B1.1 corresponding to the value of the laundered funds.  Since the value of the laundered funds is $200,000, ten levels are added for a base offense level of 18.  Because the defendant knew or believed that the laundered funds were the proceeds of a drug trafficking transaction, six offense levels are added pursuant to Section 2S1.1(b)(1).  Because the defendant was convicted under 18 U.S.C. Section 1956, an additional two offense levels are added.  So the base offense level to this point sums to 26.

G66HMCCS

1          The Court acknowledges that the parties' plea

2     agreement contains a stipulated enhancement for sophisticated

3     laundering under Section 2S1.1(b)(2)(B).  However, I have my

4     own independent obligation to evaluate the applicable

5     sentencing guidelines range in this matter, and I conclude

6     that, based on the facts before me, the government has not met

7     its burden to demonstrate that the sophisticated laundering

8     section under 2S1.1(b)(2)(B) applies to Mr. McCabe on this

9     record.  Because the defendant has a demonstrated acceptance of

10    responsibility for his offense through his plea allocution, I

11    apply a two-level reduction pursuant to Section 3E1.1(a).  Upon

12    motion by the government, an additional one-level reduction is

13    warranted under Section 3E1.1(b).  As a result, the applicable

14    guidelines offense level is 23.

15          The defendant has one criminal history point resulting

16    from one prior conviction on January 22, 2013.  The defendant

17    was sentenced to six months' probation on each of two counts of

18    harassing phone calls with each such term to run consecutively,

19    yielding one criminal history point.  In sum, I find that the

20    offense level is 23 and the Criminal History Category is I.

21    Therefore, the guidelines range in this matter is 46 to 57

22    months' imprisonment.

23          Does either party have any objections to the

24    sentencing guidelines calculation?

25          MR. BOVE:  No, your Honor.

G66HMCCS

```
 1                    THE COURT:  Thank you.

 2                    MR. GERSHMAN:  No, sir.

 3                    THE COURT:  Thank you.

 4                    Mr. Gershman, do you wish to be heard with respect to

 5       sentencing?

 6                    MR. GERSHMAN:  Yes, sir.

 7                    THE COURT:  Thank you.

 8                    MR. GERSHMAN:  Would it be appropriate if the

 9       defendant could be called as a witness at this time?

10                    THE COURT:  I will allow you to proceed however you

11       wish.  I will allow Mr. McCabe to make a statement.  Would you

12       like to make a statement before he makes his statement or would

13       you like to have Mr. McCabe alone make a statement?  I am very

14       much in your hands as to how you'd best like to proceed.  In

15       either event, I do not expect for you to call Mr. McCabe as a

16       witness; rather, I'll accept his statement.

17                    MR. GERSHMAN:  Okay.

18                    THE COURT:  Thank you.

19                    Mr. Bove, did you want to add something?

20                    MR. BOVE:  I apologize, your Honor.  I was just

21       suggesting to defense counsel that we might confer for a second

22       about how best to proceed.

23                    THE COURT:  Please do.

24                    MR. BOVE:  Thank you.

25                    (Discussion held off the record)
```

G66HMCCS

1          MR. GERSHMAN:  May the defendant remain seated for his

2     statement, Judge?

3          THE COURT:  First let me ask you, do you wish to make

4     a statement on behalf of Mr. McCabe, Mr. Gershman?

5          MR. GERSHMAN:  I would, if possible, defer till after

6     he makes his statement, Judge.

7          THE COURT:  I'd be happy to proceed in that way.

8          Mr. McCabe, do you wish to make a statement?

9          THE DEFENDANT:  Yes, your Honor.

10         THE COURT:  Thank you.  Proceed.  Please rise.

11         THE DEFENDANT:  Your Honor, I'm aware that you've read

12    the letter that I presented today, and I'm aware of how some of

13    the things that were in the reports submitted by the government

14    made me look.  I'm aware that everybody tries to sell their

15    point, and I've made every effort to be as honest as possible

16    and as forthcoming as possible with everybody up to this point.

17    I was anticipating being on the stand and being questioned by

18    both sides, so please excuse my lack of preparation.

19         The circumstances which led up to everything that

20    happened were very unusual and very, very intense, and things

21    that have happened since equally so.  But I cannot overstate

22    the amount of regret that I have for what I have done and for

23    the things that I said, and I'm aware that I said a lot of

24    things that look really harmful.  However, I ask that your

25    Honor consider that at the time I would have admitted to being

G66HMCCS

1    the second man on the grassy knoll if I thought it would have

2    helped matters, if I thought it would have helped to protect

3    the people I was in business with.  By "business," I'm talking

4    about the legitimate mining business in Colombia, or I believed

5    it to be.

6         I've let a lot of people down, and I hope to be able

7    to reconcile sooner rather than later.  I have an aging mother

8    that I would very much like to see.  I have, for lack of a

9    better term, a second family that I feel a great sense of

10   responsibility for.  And if you would grant me the opportunity,

11   I promise you I will not let you down.  That's all I have.

12        THE COURT:  Thank you, Mr. McCabe.

13        Mr. Gershman.

14        MR. GERSHMAN:  Thanks, Judge.  Would it be all right

15   if I proffer a few things before I get into an argument, Judge?

16        THE COURT:  Proceed.

17        MR. GERSHMAN:  First about some things that are not in

18   my submission, one is a letter from the defendant's mother.

19   It's talked to in the PSR that his ma is a judge in

20   San Francisco, California.  There's some statements that the

21   officer had with his ma; and, ethically, she did not feel it

22   appropriate to write a letter as a judge to your Honor, in a

23   sense did not want to play the judge card to any extent in this

24   matter.

25        They have a close relationship.  It talks about, in

G66HMCCS

1    the PSR, the family dynamics that happened early, the love that

2    she still has for Mr. McCabe.  In the past few years, she came

3    down to Florida to make sure that the businesses he were in

4    were legitimate.  They did keep a close relationship, but we

5    would ask that you not take negative that there's no letter

6    there.  The letter is not there because of her status and any

7    negative thought that this Court would have that if she wrote a

8    letter as a judge in this matter, it was maybe a little pushy

9    and inappropriate.  So she left her comments to the PSR and to

10   my proffer to you.

11           She, of course, loves Mr. McCabe and, like many family

12   members that come before you, would want him to be released as

13   soon as possible.  The PSR talks about her then-husband,

14   Mr. McCabe's father, dying early, the effect it had on

15   Mr. McCabe -- and this was in the 1970s in San Francisco -- and

16   the result and effect upon Mr. McCabe in going to, what we

17   refer to, as reform school, needing help for dual-diagnosis

18   issues.  He did, in fact, get that help and for a number of

19   years has been clean.  So to that extent, the family is

20   grateful for Mr. McCabe's staying clean.

21           Present today in the courtroom in the second row is --

22   the gentleman is a person that helped me.  The Court order

23   allowed him access to the MCC for mitigation investigation

24   purposes.

25           Next to him is a woman named Molly Rainey.  She was,

G66HMCCS

 1   at the time of defendant's arrest in 2014, the defendant's

 2   then-fiancee.  The crime happened, as the Court knows, in June,

 3   beginning of June, June 6, I believe.  Mr. McCabe is in Panama

 4   handing the 160 to the undercover, and there was a waiting

 5   period because codefendant Fares had not come into the country.

 6   I believe the government wanted to wait till December 2.

 7   Codefendant arrived; contemporaneous arrests.  During that

 8   time, they were fiancee -- Mr. Rainey was his fiancee.  Her

 9   maiden name was Ms. Raff.

10        My point is this:  They've known each other for

11   roughly a decade.  Jim Raff, Molly's father, Mr. McCabe's

12   father figure, have been friends and are solid friends.  There

13   came an issue, while Mr. McCabe was housed at MCC, that Molly

14   Raff got married and is now Molly Rainey.  And because of the,

15   I think, two-tiered love and affection the family had for

16   Mr. McCabe, they were afraid to tell him, afraid to tell him on

17   an emotional, spiritual level and the effect it would have on

18   him while he was alone at MCC.

19        I kept in constant contact with him.  They knew why I

20   was coming on Friday and was visiting Mr. McCabe.  After I

21   dropped my bags at the hotel, I got to -- he's in Brooklyn.  So

22   I got to the main detention center about 1:00-ish.  When I saw

23   Mr. McCabe, by 1:00 o'clock both Mr. Raff and Ms. Rainey had

24   advised him on this past Friday that she got married.  I would

25   proffer that, although they were -- Molly would say that she's

G66HMCCS

1    still in love with him.  Mr. Raff would say that -- he still is

2    his significant father figure in life -- they were afraid to

3    tell him over the past year because of the negative mental

4    effect it would have upon him pre-sentencing or afterwards, but

5    they wanted to tell him, although last minute, before I told

6    him that day on Friday.

7           Ms. Rainey would further tell the Court that during

8    their relationship, Mr. McCabe would do anything for her.  If

9    she needed help with anything, if she had trouble with a car or

10   trouble with any issues, her phone call would be to Mr. McCabe,

11   and Mr. McCabe was personally there to help her.  Ms. Rainey is

12   26 years old, has a bachelor of science, is a fifth grade

13   teacher in a town called Bradenton, which is in Florida.  She

14   would say positive things about Mr. McCabe's character as a

15   human being.  She still loves him.  Obviously, she's married to

16   someone else, but that love has not dwindled or left.  She has

17   moved on.  That would be my proffer, if the Court would please

18   accept, from Ms. Rainey, Judge.  As well, I meant to say on the

19   record that that was my proffer from Judge Lucy McCabe if the

20   Court would accept as well.

21          May I just go on to some other comments, Judge?

22          THE COURT:  Proceed.

23          MR. GERSHMAN:  All right.  I have this date of

24   incident happening on June 6, 2014, where Mr. McCabe does not

25   declare on the form of having greater than $10,000, going to

G66HMCCS

Panama and handing 160,000 to the undercover.  So there's
$40,000 withheld.  I don't think there's a factual issue that
Mr. McCabe kept $13,000 and has no personal knowledge as to the
exact division amongst the two codefendants or others as to the
disposition of the remaining $27,000.  But Mr. McCabe took 13.
I think at first maybe he was promised more, but for whatever
reason, he took an even $13,000.

             This is a 20-year BOP max with a three-year supervised
release.  I would agree with the PSR that he cannot afford a
fine.  His financials are self-explanatory.  He has no money.
And as Mr. McCabe briefly advised the Court, this crime was
done because of the need for money.  Mr. McCabe had put money
into that legitimate gold mine as well as Mr. Raff put
approximately -- and this is just approximations -- 140,000 of
his family money in.  That was a retirement account his wife
had of 40 and another approximate 90 or some of Mr. Raff's own
money.

             I've provided the Court as exhibits to the defense
memorandum some documents that I think substantially prove that
the gold mine was a legitimate business.  I gave the Court a
total of exhibits A through I.  And I am, just for purposes of
this portion of the conversation, directing the Court's
attention to those exhibits that are germane to the Colombian
mine.  The exhibits are listed on the bottom of page 24.

             Starting with letter C, there's roughly 20 photographs

G66HMCCS

1    of Mr. McCabe, Mr. Raff, some of the workers at the mine.  The

2    last few pages are of a certain excavator that ended up not

3    working.  Money had to be spent to try and get that excavator

4    up, and it was all -- never put into the excavator and that

5    mine never generated income.

6          But afterwards, in letters D, E, F, and G are various

7    exhibits that show money being sent, MoneyGram.  The

8    attorneys -- I would call them incorporation or corporation

9    Colombian papers for officially opening the business of that

10   gold mine.  There's further government documents showing that

11   that attorney went through lawful resources and avenues to open

12   up that gold mine.  I gave the Court just two pages of a

13   checkbook.  I have the whole checkbook, but I just gave the

14   Court two pages, the front page and then the first entry, and

15   then communications and the like between the Colombian attorney

16   that was used for this project, the government, and the

17   investors which were, in this case, Mr. McCabe and Mr. Raff.

18         Two other exhibits that I included, before getting to

19   his inmate work in a second, letter B is a Miami Police

20   Department brothers badge.  And that is his cooperation, just

21   as a friend of the Miami Beach Police Department officer,

22   helping in working with the agency to shut down two illegal

23   type businesses that Mr. McCabe previously worked,

24   entertainment businesses that Mr. McCabe had knowledge of

25   regarding ordinances, distances, and those things.  His friend,

G66HMCCS

1   a Miami Dade officer, asked him for help.  As a result of

2   certain violence and negative criminal things that were

3   happening, he gave that help just talking.  There was no open

4   case or cooperation.  It was just help.  As a result, the

5   officer gave Mr. McCabe what's referred to as a Miami Police

6   Department brothers badge.  I have that.  I put two pictures in

7   the exhibit that shows the gentlemen's name, Mr. Freed, the

8   officer, as well as the commemorative badge that's on the other

9   side of the wallet.

10         There are two letters on behalf of Mr. McCabe that I

11   would ask the Court to accept.  In them, I think what is most

12   important is what Mr. McCabe has done since he was in MCC,

13   which is listed as letter A.  It is now referred to at MCC as

14   the McCabe Program.  It had never happened before.  It has now

15   been left to others that he has taught how to do it.

16         But in general, Judge, the first couple of pages of

17   Exhibit A were written December 18, 2015, wherein number 10,

18   this positive decision report, which are very rare -- I'm not

19   sure if the Court has ever seen one, but this is out of the

20   U.S. Department of Justice Federal Bureau of Prisons, positive

21   decision report -- front page letter A, talking about

22   Mr. McCabe, his register number, times.  And as you go down to

23   number 10, it states:  "Inmate McCabe has provided his

24   expertise and service as a volunteer to the education

25   department and to the inmates of this unit, as well as the

G66HMCCS

general population of the institution, has made himself

available to instruct classes in English as a second language,

GED and adult continuing education programs, especially with

regard to career development skills.

"Mr. McCabe has given his time not only during the

daily operational hours of the educational department but his

own time conducting classes for his fellow inmates on the unit.

I can personally attest to the quality of Mr. McCabe's efforts

through my own observations and evaluations as his immediate

supervisor and by the large number of inmates who participate

in the program he provides."

The second page goes down different categories:

A.  Quality of work:  Outstanding.  Does superior

work.

B.  Quality of work:  Outstanding.  Drives self

exceptionally hard at all times.

Initiative:  Outstanding.  Has good ideas on better

ways to do things.

D.  Eagerness to learn:  Outstanding.  Eager to master

job; wants to know everything there is to know about it.

E.  Ability to learn:  Outstanding.  Very quick to

learn.  Excellent memory.

F.  Need for supervision dependability, safety, care

of equipment:  Needs little supervision.  Good record of

dependability has promptness.

1          G.   Response to supervision:   Outstanding.   Makes a
2     real effort to please the instructor.
3          H.   Ability to work with others:   Outstanding.   Gets
4     along well with everyone.   Very popular.
5          Overall job performance:   Promote the person to a more
6     demanding job at a higher pay rate.
7          Then there's a sort of handwritten two-line narrative
8     on the bottom:   "For the reasons mentioned" -- I think that
9     says.   I can't read that word too well, Judge -- "mentioned
10    above, Mr. McCabe is being recommended for a higher grade level
11    of work."
12         The next page is what he created as a school for the
13    inmates at MCC.   It's written as a calendar, and it's printed.
14    It doesn't print necessarily the exact colors that it
15    originally was but goes through language arts, math and
16    English, social studies, ESL, ESL II, math and Spanish; and it
17    has the dates, the times, the whole thing.
18         The next page is a handwritten one that he started
19    almost as a draft.   And then afterwards are the certificates
20    that he has earned while he's in MCC, which is Mandarin
21    Chinese, education tutor, reflections, tutor training,
22    Toastmasters International, unit literacy tutor, ESL as a
23    second language.   It goes on.   It has his tutor agreement which
24    has some numbers, test grade 100, signed off upon his arrival.
25    It thereafter has almost like transcripts.   The first two pages

1    are transcripts from the institution at MCC, and then the last

2    two pages are his grades that are referred to in a separate

3    section from when he was a child.  I put those last sheets

4    together with that.

5                So Mr. McCabe worked at least for, if we're averaging,

6    35 hours a week in that division.  He worked there for 70-plus

7    weeks at MCC.  He's only been in Brooklyn now about two weeks.

8    Again, on average, just by the multiplication, I come up with

9    approximately 2,400-plus hours of work that he has helped with

10   the inmates.  Through his help, approximately 350 inmates have

11   passed their GED.  There are another 100-plus that are in the

12   testing phase to see where they place to go for that GED.

13   That's the time that he was taken from MCC, just ballparking

14   it, three weeks ago to Brooklyn.  He kept everything there for

15   the next person that he taught because, obviously, the end was

16   going to come one way or another, transfer or sentence.  So

17   there's catalogs, there's materials, cupboards, and he has

18   trained others to carry on.  He also helped others in less

19   formal settings because they knew the work he did.  They would

20   come to him and ask him for help in any of the different

21   languages or any of the different topics.

22                To that extent, Judge, in my memorandum, when I

23   discussed this topic in the section asking for variance, I

24   titled that on page 8 "Defendant's Truly Unprecedented

25   Accomplishments During his Pretrial Detention in MCC."  I

G66HMCCS

1  think, although I'm not supposed to say I, defense thinks that

2  those accomplishments are unique to anyone the Court has seen

3  in the past or will see in the future.  You will always have

4  the defendants that will express remorse or be contrite or talk

5  about things that they have done positive on the outside before

6  arrest, but in these 18 months, Mr. McCabe on his own, without

7  Court order, voluntarily has helped, in my opinion, greater

8  than he did even while on the outside.  And I think that says

9  something about the person, at least about the person trying to

10  get better, trying to help others, trying to do anything that

11  is positive because at some point of the assimilation into

12  society in the release, whenever the Court deems release is

13  appropriate.  He's done great with that, and that stands out

14  above and beyond love and support of family.

15       He's in there alone.  As the Court knows, all he has

16  is CorrLinks and a couple hundred minutes on the phone a month,

17  and he took it upon himself and has maintained it.  Even when

18  he got to Brooklyn, day of going to Brooklyn, he filled out the

19  form:  Let me do it here.  Never got a response, maybe because

20  it was too short of a time from this transfer until the

21  sentencing.  So I would ask the Court to consider his work at

22  MCC when constructing a sentence.

23       On the first page of my memorandum, I just sort of did

24  a conclusory sort of couple paragraphs where I asked for 23

25  months followed by three years.  Part of that thought was the

G66HMCCS

following:  Mr. Cristo-Fares, if I'm pronouncing that right,

the Court did not give pretrial supervision because of removal

or deportation proceedings, which is usually sort of useless.

They come in and have their 24 hours to report.  So the Court

gave him the high end of the guidelines, 57, I think.

         The structure that I propose, 23, which is half of

bottom, plus maximum three-year pretrial would have Mr. McCabe

still supervised in combination by the government for a greater

amount of time than Mr. Cristo-Fares.  Only for a couple of

months, but still for a greater amount of time.

         That gives, from our position, under the factors and

the findings the Court makes, a reasonable sentence, not

greater than -- the basic language that the Court will say

before imposing whatever the Court imposes upon Mr. McCabe.

And we think, from a criminal point of view, he has obviously

accepted responsibility.  He did the crime.  I made an argument

on the bond appeal to your Honor which I included in my motion,

which I'll refer to as puffery or the argument that the

government makes that -- in sort of return to my argument that

from June when the crime happened until December when

codefendant came back into the country, Mr. McCabe remained

crime free, the government made a comment, I think, in their

sentencing memo to the effect that, well, that wasn't

because -- I'm just paraphrasing, Mr. Bove -- paraphrasing that

it wasn't because of not wanting to, because there are

G66HMCCS

1    recordings, admittedly, where Mr. McCabe is on the phone --

2    what I would call the puffery because Mr. McCabe never had the

3    ability, the financial ability, the plane ability, the boat

4    ability, or the resources necessary to do any of the things

5    that were discussed on the phone.  I'm not minimizing.  The

6    discussion should not have happened.  It should have been a

7    divorce from the situation once money was delivered.  But I

8    would ask the Court to consider that.

9         Another area I would ask the Court to consider was

10   Mr. McCabe was arrested in or around the home where the Raffs

11   are, and that is in the Sarasota, Florida, area.  At the time,

12   Mr. McCabe had, besides a valid Colombia work visa, he had a

13   valid Florida carry concealed weapons permit.  In Mr. McCabe's

14   car at the Raff's home, where he's not arrested -- he's

15   arrested some yards away.  I believe 100.  I could be off on

16   that, but it was a distance away -- in the glove compartment of

17   that car is a gun.  Mr. McCabe kept the gun in the glove box

18   because -- trying to follow the CCW rules, unloaded that gun,

19   and put the magazines in his pocket.  There is a picture in the

20   government's sentencing memorandum that has a picture of the

21   gun which looks like one live round, a magazine outside the

22   gun, and the gun.  You can't tell if it's in the glove box or

23   not, but it's for sure a picture of it at the beginning of

24   their sentencing memorandum.

25        When I confront Mr. McCabe with it, he for sure

G66HMCCS

```
1    maintains that the gun is unloaded, because he didn't want the

2    Raffs to get in trouble.  It's at their home.  And the

3    ammunition is put in his pockets.  There is some discussion in

4    the paperwork about finding a magazine in Mr. McCabe's pocket.

5    The government might make an argument that there were actually

6    two magazines, one from his pocket, one from the photo.  I

7    would proffer that Mr. McCabe would say there were two

8    magazines, but both are in his pocket.  The gun was left

9    unloaded.

10            Procedurally, Judge, once arrested, as stated in the

11   paperwork, he was cooperative with law enforcement to the

12   extent that they asked him questions and he answered them,

13   incriminating himself.  He was taken to the West Palm Beach

14   division of Florida before he was removed here.  I was provided

15   discovery in a timely manner, discussed it with the government,

16   and unlike the -- well, not disparaging anyone, I would ask the

17   Court to differentiate the issues with attorneys and discovery

18   as to the other defendant or defendants and realize that

19   everything was done, I thought, smoothly with the government.

20   Discovery provided.  I announced in Court when you had a

21   scheduling hearing both defendants were ready for a change of

22   plea.  Change of plea happened.  There were a couple of

23   continuances.  I know I had a personal college thing with my

24   daughter once that caused a continuance, but otherwise, there

25   was no need for the government to spend their resources and
```

G66HMCCS

1    otherwise extend themselves any further than was necessary in

2    this case.

3             If I could just review my notes for a second, please,

4    Judge?

5             THE COURT:  Please take your time.

6             MR. GERSHMAN:  So there's one other topic, Judge, that

7    I would like to bring up.  I'm not sure it carries any weight

8    or thought with you.  But this weekend when I was here and

9    doing some research, I found a case out of the United States

10   District Court Eastern District of New York that was filed in

11   the Brooklyn clerk's office on May 25, 2016.  I printed it out

12   at the hotel.  I did not upload it, but it is written by Senior

13   United States District Court Judge Frederic Block.  And I have

14   at least enough copies for your Honor and the government.

15            But if the Court would consider that this opinion

16   discusses what he refers to as, outside of any sentence that

17   the Court gives, the collateral effects upon a convicted

18   defendant on the outside of society which some in the system

19   would call civil death.  I don't need to go down the list for

20   your Honor, but your Honor knows that when a defendant is a

21   convicted felon, it talks about -- or His Honor talks about the

22   effects that the federal government's benefits, for example,

23   have upon a convicted defendant.  Federal law alone, a felony

24   conviction will render an individual ineligible for public

25   housing; Section 8 vouchers; Social Security Act benefits;

G66HMCCS

1    supplemental nutrition benefits; student loans; Hope

2    Scholarship; Legal Services Corp., public housing eviction

3    proceedings; disqualify individuals from holding various

4    positions; and, of course, the "check the box" on the private

5    employer.  And as the Court knows, President Obama has

6    initiated by executive order trying to get rid of that "check

7    the box" until the end of the employment process so those

8    capable of fulfilling a job who are convicted felons are not

9    checking that box initially, and that's something that I know

10   from the top is trying to occur.

11           Every state disenfranchises convicted felons to some

12   extent.  I think there's a couple exceptions of Maine and

13   Vermont.  And in this case, this was a drug trafficking case

14   where a woman was charged with importing cocaine, I think it

15   was 600-plus grams, and possession of cocaine and that this

16   judge on a 20, plus or minus, month guideline sentenced her to

17   one year.

18           There's some other quotes that if I just may take up

19   the Court's time on that for a second, Judge.  20 U.S.C. 1091,

20   defendant is a college student.  Held internship as a child.

21   Will be ineligible for grants, loans, work assistance for a

22   period and duration of her college career.  There's, of course,

23   the denied admission to federally assisted housing for a

24   reasonable time; not eligible for assistance under any state

25   program as part of Title IV of the Social Security Act.  She

G66HMCCS

cannot be issued a passport during her term of supervision.

And then it goes into some of the licensing areas of childcare,

pharmaceutical, transportation, hospice, and those areas that

need licensing.

So to the extent that the Court would consider the

collateral effects that this sentence would have on Mr. McCabe

upon his exit from BOP, whenever the Court deems that to be

fair and reasonable, we would ask the Court to consider that

theory.  We think that the 23 months followed by three years

effectuates the need to confine and supervise Mr. McCabe for

the reasons expressed, Judge.  If the Court has any questions,

I apologize I ran on a little bit, but that will be our

presentation please, Judge.

THE COURT:  Thank you, counsel.

Mr. Bove, does the government wish to be heard with

respect to sentencing?

MR. BOVE:  Yes, your Honor.  Thank you.

With respect to that last point, your Honor, about the

collateral consequences of conviction, I'm not sure about the

criminal history of the defendant at issue in a case that

defense counsel was just describing, but this is not the

defendant's first conviction, while although it is actually his

first federal conviction.  Prior convictions were not enough

and the lateral consequences of those convictions were not

enough to incentivize this defendant to refrain from further

G66HMCCS

federal conduct.

I know this is the second sentence in this case.  Your Honor's read the submissions, and so you're familiar with the conduct itself, having already found that it was indeed serious.  This is the type of behavior that facilitates and allows drug traffickers on an international level to engage in these activities.  It allows them to do so lucratively and to their financial benefit.

There's just two points I want to make in response to the counsel's comments about the conduct.  There's a little bit of a back and forth in the submissions about the reason for the gap in time between the delivery of the purported drug proceeds in Panama and the defendant's arrest.  We've cited in our submission to these communications between the defendant and one of the confidential sources in August and September of 2014.  The government's position is that those reflect not puffery, your Honor, but his intent, the defendant's intention that if presented with further opportunities to engage in additional or enhanced criminal conduct, that that was what the defendant wanted to do in late summer and early fall of 2014.

Counsel also has made some comments today about the firearm that was seized incident to the defendant's arrest and the reason for its presence and the status of the gun at the time it was seized.  The principal aggravating consideration there, your Honor, arises from the defendant's post-arrest

G66HMCCS

1   statement.  The gun was there for the purpose security.  In his

2   words:  In case something -- just in case something happened.

3   That firearm was brought to an intended meeting, or the

4   vicinity of an intended meeting, with someone the defendant

5   understood to be an international drug trafficker.  It

6   drastically increased the likelihood of danger to others that

7   arises from this offense, and it's another feature of this

8   conduct that is aggravating beyond some of the characteristics

9   with respect to the other defendants.

10          All that said, your Honor, I think the one thing that

11   makes this a complex sentencing is that there is a significant

12   tension between the defendant's history and his offense conduct

13   and, frankly, his statements today and his presentation.  I

14   don't think I would be doing my duty to the Court to not

15   acknowledge that some of the things that the defendant and

16   counsel has brought to the Court's attention about the time

17   since his incarceration are mitigating.  And on their face,

18   objectively, it's very hard to dispute that, and I'm not

19   disputing that.

20          There is, though, a question here of intent, of who

21   Mr. McCabe really is.  And I don't think this is a proceeding

22   where that's going to get resolved or it needs to get resolved

23   except insofar as it bears on his risk of recidivism, and the

24   risk here that this is a defendant who as an individual needs

25   to be further deterred beyond the general deterrence points

G66HMCCS

1     that I've made at this and other sentencings.

2              In response, I think that that general concept, one of

3     the things that Mr. McCabe said today was when I was speaking

4     to the confidential source and when I was talking during the

5     offense conduct, I was willing to say whatever was necessary to

6     try and make this go forward.  I was in dire straits, and I was

7     desperate.  Your Honor, I submit that those incentives are even

8     heavier today.  That the defendant is in a position where he

9     needs to tell the Court, he needs to be able to tell your

10    Honor, that he is a changed man and that he is rehabilitated.

11    That argument is called into question by the CFTC-related

12    conduct that is outlined in my sentencing submission.  I spoke

13    with counsel before this proceeding, and I think he's going to

14    want to address that when I sit down, and I understand that

15    there's some dispute about whether Mr. McCabe actually knew

16    that that order had been entered by the CFTC.  I, frankly, find

17    that puzzling, your Honor if there's a public announcement by

18    federal regulatory body in the vicinity of someone's residence,

19    where they're making their livelihood, that that would not in

20    some way or another, whether to counsel or friends who just

21    read the news and the Internet, be brought to the defendant's

22    attention.  I find it hard to believe that that's not the case.

23             But what's more troubling, your Honor, with respect to

24    this question of to what extent should the defendant be

25    credited in claiming to have been rehabilitated today before

G66HMCCS

 1    the Court, is the conduct itself, because it involves actually

 2    victimizing people in what appears, on the face of the CFTC's

 3    findings, a fraudulent way.  That's not the only time the

 4    defendant's engaged in conduct sounding in fraud.  His

 5    conviction in 1989 also related to insurance fraud.  So there's

 6    some history, your Honor, here of a man who's willing to say

 7    what needs to be said to achieve his own purposes.

 8           Again, this is a factual question that I think is very

 9    difficult to resolve in a proceeding like this.  I submit that

10    there's a significant risk here that this is a defendant who

11    will recidivate because there's a prolonged course of conduct

12    between the CFTC-related activities and then this activity, a

13    man who has now admitted he was desperate and willing to do

14    anything for money, that when presented with a similar

15    situation in the future, that he would make those same

16    decisions.

17           The guidelines here in this case, your Honor, in some

18    respects, I think, understate the seriousness of this offense.

19    The defendant's comments to the confidential source, as I said

20    earlier, reflect an intention to engage in a larger amount of

21    money laundering than just the $200,000 that were transmitted

22    to Panama.  They also reflect a level of communication with at

23    least Tirso Dominguez, if not William Cristo-Fares, that

24    suggests he was aware of the full scope and intention of the

25    discussions that all the defendants were having with the

G66HMCCS

| | |
|---|---|
| 1 | confidential source.  That full scope of that conspiracy, even |
| 2 | if it doesn't count for sophistication as a guidelines |
| 3 | enhancement, certainly had indicia of sophistication. |
| 4 | These are all things, your Honor, I submit, would |
| 5 | warrant potentially a sentence above the guidelines.  As I've |
| 6 | also conceded today, there are some factors that are brought to |
| 7 | the Court's attention, and in particular the things that he's |
| 8 | done since he was arrested in this case, that I think are |
| 9 | mitigating.  On balance, given the seriousness of this offense, |
| 10 | given his criminal history, the risk of recidivism, I submit |
| 11 | that a guidelines sentence is appropriate. |
| 12 | THE COURT:  Thank you, Mr. Bove. |
| 13 | Counsel, Mr. Bove suggested you may want to say |
| 14 | something in response to his comments.  If you'd like to do so, |
| 15 | I'll give you that opportunity. |
| 16 | MR. GERSHMAN:  Thank you.  Just a couple of things, |
| 17 | please, if I may.  Regarding the continued verbal telephone |
| 18 | conversations in the intervening crime to arrest period -- |
| 19 | again this is proffer, Judge, and I ask the Court to accept -- |
| 20 | Mr. McCabe was directed to keep that going.  He did not further |
| 21 | crime or act upon it.  He was told to keep these people happy |
| 22 | from the codefendant. |
| 23 | Issue with the gun, Mr. McCabe would say that he did |
| 24 | not make the statement about keeping the gun for protection, |
| 25 | for necessity, in any meaning or furtherance of crimes in this |

1    case.  I think the PSR also speaks to that.

2         The government talks about the Colorado arrest, which

3    in the PSR is on page 9, and that is 1989 when the defendant

4    was at Gunnison College in Colorado.  So that's February.

5    That's 27 years ago.  And defendant's memory of that is a

6    conviction for false reporting to authorities.  But to put that

7    in context, I think that that occurred while he was a college

8    student.  As the PSR mentions, I don't know if it was Gunnison

9    State, Colorado State, but the school was in Gunnison,

10   Colorado, and that happened during his school years.

11        Then, finally, on this civil judgment, I would point

12   out -- and I briefly discussed this as well with the government

13   before coming into court, Judge.  They address in their

14   discussion section this federal regulatory action, and I think

15   factually some of the things are incorrect about that beginning

16   on page 8, which is their third point:  Third, the

17   circumstances giving rise to a federal regulatory action

18   related to the defendant's 2012 arrest in Florida, which he

19   failed to disclose to the probation office in his sentencing

20   submission, reflect a heightened recidivism.

21        Next paragraph:  In August 2012, McCabe was arrested

22   and subsequently convicted of two state law felony counts.  I

23   think that's a misprint, because if you look at the PSR,

24   August 2012, page 9, paragraph 44, he got convicted of

25   misdemeanors.  So Mr. McCabe stands before the Court having

G66HMCCS

only been a convicted felon one time, and that is upon Court's

acceptance of this plea.  Those harassing phone calls out of

Broward County, which is Fort Lauderdale, Florida, were

misdemeanor harassing phone calls which gave him six months'

probation each, page 9, 44.  So that's one as to the agency.

Then, finally, which I think the government is not

confident in the argument I'm about to say to you, and that is,

in that regulatory action, he was represented by an attorney

named Fred Schwartz who the Court knows maybe from the

beginning of this case was an attorney for Halim Fares.  After

some recordings were given by the government and Mr. Fares was

seen with an attorney card of Mr. Schwartz as a Florida -- I'm

not sure if he said associate, but a business card that Halim

had relative to Fred Schwartz, Fred Schwartz was Mr. McCabe's

attorney for that civil matter that the government discussed.

I would proffer that before the civil matter was filed or

instigated by the agency, Mr. McCabe went into Mr. Schwartz's

office, advised him of that civil matter, not criminal.  The

word "criminal" never came up.  Noncriminal in nature.  This

civil lawsuit.  Presented Mr. McCabe with a document to sign to

get it over with.  Mr. McCabe signed it and moved on.  And

Mr. McCabe did not think, not only pursuant to Mr. Schwartz's

advice at the time, but when he moved forward over the years

and the three companies, for credit purposes or any other

financial purposes, that judgment never came up.  Other things

G66HMCCS

1    did that are reflected in the PSR.  But that specific judgment

2    that he signed with attorney Fred Schwartz, he remembers

3    signing it, he remembers it resolving when he walked out of the

4    office, and the final words were:  You're good, Sean.  They

5    can't collect from you.  And in Mr. McCabe's mind, it was done

6    and then confirmed done over the years as nothing about it came

7    up.

8              Those are the additional comments.  Thank you, Court.

9              THE COURT:  Thank you very much.

10             Is there any reason why sentence should not be imposed

11   at this time, Mr. Bove?

12             MR. BOVE:  No, your Honor.

13             THE COURT:  Thank you.

14             Mr. Gershman?

15             MR. GERSHMAN:  No, your Honor.

16             THE COURT:  Thank you.

17             I will now describe the sentence that I intend to

18   impose.  Counsel will have a final opportunity to make legal

19   objections before the sentence is finally imposed.

20             As I've stated, the guideline range applicable to this

21   case is 46 to 57 months' imprisonment.  I've considered the

22   guidelines range.  Under the Supreme Court's decision in *Booker*

23   and its progeny, the guidelines range is only one factor that I

24   must consider in deciding the appropriate sentence.  I'm also

25   required to consider the other factors set forth in 18 U.S.C.

G66HMCCS

Section 3553(a).  These include, first, the nature and

circumstances of the offense and the history and

characteristics of the defendant; second, the need for the

sentence imposed to (a) reflect the seriousness of the offense,

to promote respect for the law, and to provide just punishment

for the offense; (b) to afford adequate deterrence to criminal

conduct; (c) to protect the public from further crimes of the

defendant; and (d) to provide the defendant with needed

vocational or educational training, medical care, or other

correctional treatment in the most effective manner; third, the

kinds of sentences available; fourth, the guidelines range;

fifth, any pertinent policy statements; sixth, the need to

avoid any unwarranted sentence disparities among defendants

with similar records who have been found guilty of similar

conduct; and, seventh, the need to provide restitution to any

victims of the offense.

Ultimately, I'm required to impose a sentence

sufficient, but not greater than necessary, to comply with the

purposes of sentencing that I mentioned a moment ago set forth

in the statute at 18 U.S.C. Section 3553(a).

I've given substantial thought and attention to the

appropriate sentence in this case.  I've reviewed all of the

submissions that the parties provided to me.  And I've

considered all of the Section 3553(a) factors and the purposes

of sentencing as reflected in the statute.  Now, based on my

G66HMCCS

review of all of the factors, which I intend to discuss in more

detail in a moment, I intend to impose a non-guidelines

sentence of 25 months' incarceration to be followed by three

years of supervised release, subject to the mandatory and

special conditions described in the presentence report which I

will detail with more specificity later.  I do not expect to

impose a fine.  I expect to be ordering forfeiture.  I will

also impose a mandatory fee of $100.

Now, the nature of the crime here is very serious.

The defendant conspired to launder funds that he considered to

be drug proceeds.  The amount of money laundered, I think in

this instance, was relatively modest on the grand scheme of

things; but I do not understate the amount that money

laundering contributes to drug trafficking generally in this

country.  It is a very serious offense, and it fuels other

criminal activity.

I spent a lot of time with the materials that were

submitted to me about you, Mr. McCabe, and I'd like to review

some of those materials now.  Mr. McCabe was born in Stanford,

California, in 1970.  Your parents, both lawyers, separated

when Mr. McCabe was seven and, tragically, as we heard again

today, his father passed away when Mr. McCabe was only 13.

Although Mr. McCabe is the child of a judge who does not want

to play the judge card, he was exposed at a young age to drugs

and struggled with drug addiction as a teenager.  Ultimately,

1    Mr. McCabe was sent to attend two boarding schools, and I

2    understand was able to successfully conquer his addiction to

3    drugs, a fact that he refers to in his letter to me today.

4         Mr. McCabe attended Western State Colorado University

5    from August 1988 until May 1993.  He left in good academic

6    standing to pursue a business venture.  Despite the fact that

7    he did not receive a college degree, Mr. McCabe is clearly a

8    very smart man, with many interests and talents:  A skier, a

9    dirt biker, guitarist, SCUBA diver, helicopter pilot, and

10   rescue worker.  His work history is varied.  He has owned and

11   managed adult entertainment establishments in Florida.  He's

12   worked as a professional poker player, an import/export

13   consultant, a sales executive in a precious metals company, and

14   owned an interest in an ill-fated gold mine in Colombia, which

15   by the way, Mr. Gershman, is with an "O" when you're referring

16   to the country; "U" when you're referring to the university.

17        Mr. McCabe is a skilled entrepreneurial polymath, but

18   unfortunately not all of his ventures have gone well.  He's

19   already crossed the line in one of his business ventures which

20   resulted in a criminal conviction that I detailed earlier and,

21   as I understand it, federal regulatory action.

22        Mr. McCabe has not been married but has a number of

23   strong relationships.  Among them, his friendships with the

24   Raff family, both his ex-fiancee, who's here today, and her

25   parents, who submitted very kind letters on his behalf.

G66HMCCS

Mr. Raff has offered Mr. McCabe a place to live in Florida upon

his release.  And the level of support from those friends and

the regard for his personal qualities weigh favorably as I

evaluate Mr. McCabe's sentence for this offense, very much so.

I understand that Mr. McCabe's role in this offense

was relatively minor, putting aside his comments in the window

after he delivered the cash.  He was contacted by Mr. Dominguez

who acted as at intermediary between him and Mr. Cristo-Fares.

Mr. McCabe did not negotiate or organize the money laundering

exercises.  As I understand it, he was the pointed end of the

spear who functioned essentially as a mule to carry the funds

from the United States abroad.  He did so according to

instructions, in a way that I've described in the prior

sentencing as very simply by carrying cash in his bag.

While the United States points me to comments that

Mr. McCabe made during the transaction suggesting a willingness

to conduct other more extensive crimes, I have no evidence that

he committed any crime during the period after he transported

the funds at issue in this case and the date of his arrest.

I also take into account the defendant's assertions

regarding his severe economic situation that he faced at the

time that he chose to undertake this criminal act.  A desire

for financial gain never justifies crime.  I appreciate

defendant's argument that he was approached regarding this

criminal, I'll call it, opportunity at a time when he was

G66HMCCS

confronted with a pressing specific financial need to acquire

equipment to allow his gold mine venture to get off the ground.

I understand that the car that Mr. McCabe was in around the

time of his arrest contained an unloaded gun, but I have no

evidence that suggests that Mr. McCabe possessed that weapon

illegally or that he was involved in any kind of violence in

connection with this crime or any other.

I believe that a meaningful sentence is important in

this case to impose a just punishment.  I'm required to

consider the deterrent effect both on Mr. McCabe personally and

to deter others from committing this crime.  With respect to

personal deterrence, which I agree with Mr. Bove is a

significant issue here, significant because Mr. McCabe,

frankly, was old enough at the time of this offense to know not

to do what he did; concerning because of his prior criminal

conviction.  At the same time, I'll be imposing a substantial

term of supervised release in addition to what I think is

meaningful jail time, which I hope will be sufficient to

prevent Mr. McCabe from committing further criminal acts.

I must also consider the role of general deterrence,

and a meaningful sentence is important to dissuade others from

offering to launder drug proceeds.  That factor I weigh against

the other factors, including the ones that I've just

articulated and will proceed to describe in more detail

momentarily.

G66HMCCS

1      I've considered the need to avoid unwarranted

2  sentencing disparities.  In this case I am imposing a shorter,

3  much shorter, period of incarceration on Mr. McCabe than his

4  codefendant Mr. Cristo-Fares.  I do that in recognition of the

5  fact that Mr. McCabe's role in this offense is more limited

6  than that of Mr. Cristo-Fares.  Essentially, as I said earlier,

7  he acted as a mule for this cash in a transaction coordinated

8  and negotiated by Mr. Cristo-Fares who, unlike Mr. McCabe, was

9  a practicing attorney without great financial need to motivate

10  his offense.  While Mr. McCabe's term of incarceration is

11  shorter than that of Mr. Cristo-Fares, as Mr. Gershman notes,

12  Mr. McCabe will also be subject to a substantial period of

13  supervised release.

14      I also take into account the positive acts that

15  Mr. McCabe has undertaken as a prisoner at the MCC and MDC.

16  Mr. Bove asked me to consider that in light of your motivation

17  to present yourself as a person who's rehabilitated himself in

18  connection with this sentencing.  That's true of everyone that

19  appears in front of me.  You've done more, and I appreciate

20  that, and I think that that's a fact that has to weigh in your

21  favor as I consider the sentencing here.  I note your letter to

22  me refers to the philosophy of the Dalai Lama, and the quote

23  from you says that you should do whatever you can to help

24  people in their lives.  I appreciate that you've done what you

25  did to help your fellow prisoners, and I hope that you'll

G66HMCCS

1    continue to do that in the future.

2          To be clear, you're not helping anybody if you're

3    engaged in criminal acts to do so, and that is not a

4    justification to engage in criminal acts.  So to the extent

5    that you view in any part this philosophy as justifying

6    criminal behavior, I do not agree.  But I agree with the

7    philosophy that it's good to help if you can, and I hope that

8    you'll do that and you'll take advantage of this time to do so.

9          I believe that the proposed sentence reflects the

10   seriousness of the offense, promotes respect for the law, and

11   provides just punishment under the circumstances.  I've

12   considered Mr. McCabe's ability to use the period of

13   incarceration for educational and vocational training, medical

14   care, or other correctional treatment.  I appreciate that

15   Mr. McCabe has taken advantage of the existing programming in

16   prison and, more importantly, as I described earlier, I

17   appreciate the affirmative steps that he's taken to educate

18   other prisoners.  Those efforts deserve recognition and

19   affirmation.

20         I've considered the kinds of sentences available in

21   this case.  While I believe that a sentence with a meaningful

22   term of incarceration is necessary given the nature of the

23   offense and Mr. McCabe's involvement in it, I believe that the

24   blend of time in prison and supervised release is appropriate

25   here.

G66HMCCS

          I've given serious consideration to the guidelines and

the policy statements in this case.  I believe that a

non-guidelines sentence is appropriate.  I think that a longer

period of incarceration is not necessary in this case, given

the nature of Mr. McCabe's role in the offense principally but

also given Mr. McCabe's abilities.  I hope that he will take

this opportunity to make productive use of his skills outside

of prison.

          Mr. McCabe, would you please rise for imposition of

sentence.  It is the judgment of this Court, Mr. McCabe, that

you be sentenced to 25 months of incarceration.  I find that

sentence to be sufficient, but not greater than necessary, to

comply with the purposes of sentencing set forth in 18 U.S.C.

Section 3553(a)(2).

          Following your term of imprisonment, I am sentencing

you to a term of three years of supervised release, which is

within the guideline range.  The mandatory conditions of

supervised release shall apply.  They are the defendant shall

not commit another federal, state, or local crime.  The

defendant shall not illegally possess a controlled substance.

The defendant shall not possess a firearm or destructive

device.  The defendant shall cooperate in the collection of DNA

as directed by the probation officer.  The mandatory drug

testing condition is suspended due to the imposition of a

special condition requiring drug treatment and testing.

1            The standard conditions of supervised release 1

2    through 13 shall apply.  In addition, the following special

3    conditions shall apply:  The defendant shall submit his person,

4    residence, place of business, vehicle, and any property,

5    computer (as defined in 18 U.S.C. Section 1030 Exhibit 1),

6    electronic communications, data storage devices, and/or other

7    media under his control to a search on the basis that the

8    probation officer has reasonable belief that contraband or

9    evidence of a violation of the conditions of the release may be

10   found.  The search must be conducted in a reasonable time and

11   in a reasonable matter.  Failure to submit to a search may be

12   grounds for revocation.  The defendant shall inform any other

13   residents that the premises may be subject to search pursuant

14   to this condition.

15            The defendant will participate in an outpatient

16   treatment program approved by the United States Probation

17   Office which program may include testing to determine whether

18   the defendant has reverted to using drugs and alcohol.  The

19   defendant shall contribute to the cost of services rendered

20   based on the defendant's ability to pay and the availability of

21   third party payments.  The Court authorizes the release of

22   available drug treatment evaluations and reports, including the

23   presentence report investigation report, to the substance abuse

24   treatment provider.

25            The defendant shall be supervised in his district of

G66HMCCS

1      residence.  The defendant is to report to the nearest probation

2      office within 72 hours of release from custody.

3              Mr. McCabe, there will be no fine because the

4      probation office reports that you are unable to pay one.  The

5      defendant must pay to the United States a total special

6      assessment of $100, which shall be due immediately.

7              Mr. Bove, I understand that the United States is

8      seeking forfeiture of $40,000; is that correct?

9              MR. BOVE:  Yes, your Honor.

10             THE COURT:  And you've submitted a form of forfeiture

11     order.

12             Mr. Gershman, do you have any objections to the form

13     of forfeiture order presented by the United States in this

14     matter?

15             MR. GERSHMAN:  Defense does not.

16             THE COURT:  Thank you.

17             I'm going to order that the defendant forfeit a sum of

18     $40,000 in U.S. currency.  I'm going to enter a written order

19     containing the substance of this order at this time or

20     immediately following this proceeding.

21             Mr. Bove, I understand the government's not seeking

22     restitution; is that correct?

23             MR. BOVE:  Yes, Judge.

24             THE COURT:  Thank you.

25             Does either counsel know of any legal reason why

G66HMCCS

1    sentence shall not be imposes as stated?

2              MR. BOVE:  No, your Honor.

3              MR. GERSHMAN:  Not from defense, Judge.

4              THE COURT:  Thank you.

5              The sentence as stated is imposed.  I find that

6    sentence to be sufficient, but not greater than necessary, to

7    comply with the purposes of sentencing set forth in 18 U.S.C.

8    Section 3553(a)(2).

9              You can be seated, Mr. McCabe.  Thank you very much.

10             THE DEFENDANT:  Thank you very much, your Honor.

11             THE COURT:  Mr. McCabe, you have the right to appeal

12   your conviction and sentence except to whatever extent you may

13   have already waived that right as part of your plea agreement.

14   The notice of appeal must be filed within 14 days of the

15   judgment of conviction.  If you're not able to pay the costs of

16   an appeal, you may apply for leave to appeal in forma pauperis.

17   If you request, the clerk of court will prepare and file a

18   notice of appeal on your behalf.

19             Are there any other applications at this time,

20   Mr. Bove?

21             MR. BOVE:  No, Judge.

22             THE COURT:  Mr. Gershman?

23             MR. GERSHMAN:  No.  Thank you, Judge.

24             THE COURT:  Thank you.

25             Let me just take a couple of minutes before we

G66HMCCS

adjourn.  Mr. McCabe, as you can see, I've read through all the

materials that were submitted to me very carefully.  I think

that you're a man with great capacity.  That comes through in

the materials that are submitted to me.  That's part of what

makes this situation so unfortunate.  I hope that you've

learned a lesson from this event.

     Let me just highlight some things for you.  You know

you can be caught.  You know from this that anybody you talk to

could be a government agent.  You are now a convicted felon,

which I expect would weigh against you if you were ever caught

or convicted of another crime and sentenced for it.  Your

lawyer will advise you on this, but as you just heard, one of

the conditions of the terms of your supervised release is that

you not commit any other crime.  If you commit another crime,

that, in addition to the underlying substantive offense, could

be viewed as a violation of the terms of your supervised

release which, as your will attorney will advise you, would or

could result in you being in front of me again for sentencing

in connection with the violation of the terms of your

supervised release in addition to whatever other sentence is

imposed for that other offense.

     Again, I think that you are a smart man.  With those

factors in mind, I'm very much expecting that as you weigh

decisions that are put in front of you going forward, you are

going to choose to avoid further criminal acts.  Put simply,

G66HMCCS

1    the risk of you being caught again is much higher, and the risk

2    of a significant, even more significant, penalty has

3    dramatically been increased as a result of your conviction and

4    sentence here.  So as you run the numbers and evaluate the risk

5    and reward of crime, as you've done successfully as a poker

6    player, I hope that you'll take those factors into account and

7    that will lead you to do the right thing, which is to help

8    yourself and your friends and loved ones but not to allow that

9    desire to help other people lead you to do something like this.

10   I hope you don't, because if you do, I'll see you back here

11   again.

12          With that, let me thank former Ms. Raff for being

13   here.  I appreciate your support, your parents' support for

14   Mr. McCabe.  Their support for him and providing him a place to

15   be after he's released was a very important factor for me in

16   considering the appropriate sentence for him and in the hope

17   that he'll be able to find a clear path forward after he's

18   released from this time of incarceration.  I hope that you and

19   your family members will continue to support him after his

20   release.  So thank you very much for doing that.

21          This proceeding is adjourned.  Thank you very much.

22          (Adjourned)

23

24

25